UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| Tammy Logan, | No. 2:20-cv-01742-KJM-JDP |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| The Prudential Insurance Company of America, et al., | |
| Defendants. | |

    Plaintiff Tammy Logan challenges defendant Prudential Insurance Company of America's denial of her claim for long-term disability benefits under the Employee Retirement Income Security Act (ERISA). As explained in this order, Prudential incorrectly denied her claim for benefits for the period between June 19, 2019 and July 2, 2021.

**I.    BACKGROUND**

    Logan began working for Sentry Insurance in 2016. AR 7. In 2018, she was a senior claims representative. *Id.* According to the job description, senior claims representatives investigate, evaluate, and make decisions about claims for insurance. *See* AR 129–30, 1588. They consult with customers, create claims files, and attend mediations, settlement conferences, and trials. *Id.* They might also collect evidence, such as by taking recorded statements and obtaining police and medical reports or appraisals. AR 129–30. Most of Logan's days were

1

1    spent sitting, working at a computer, and in meetings or calls.  AR 1588.  She worked eight to ten
2    hours a day, sometimes more, and sometimes also on the weekend.  *See* AR 1588–89.

3    In late December 2018, Logan fell from a ladder and fractured her ankle.  AR 7, 254.  She
4    went to the hospital.  AR 742.  The next day, she saw Dr. Stephen Barad, an orthopedic surgeon,
5    who performed an operation to stabilize and heal her ankle through a procedure known as an open
6    reduction and internal fixation.  AR 742, 762.  She was discharged two days later, and her doctors
7    advised her not to work while she was recovering.  AR 18, 29, 742.  Dr. Barad instructed her
8    specifically not to spend time sitting, standing, using a keyboard, or rotating and flexing her
9    wrists.  AR 29–30.

10   A few weeks later, an x-ray of her ankle showed a "stable alignment" and no "definite
11   hardware loosening or fracture," but there was a "faintly seen" fracture line, "suggesting
12   incomplete healing."  AR 1459.  Logan saw Dr. Barad for a follow-up visit.  AR 254.  He wrote
13   that she was "doing well."  *Id.*  He described the alignment of her ankle as "perfect" and the
14   mortise "well maintained."  *Id.*  His plan was for Logan to gradually increase the amount of
15   weight her ankle could bear using a boot.  *Id.*  He scheduled a follow-up visit in four to six weeks
16   and created a therapy program.  *Id.*

17   Despite these initially positive signs, Logan's recovery stalled.  In March, she still had
18   swelling and discomfort in her ankle.  AR 1459.  She could not sit for long periods of time.  *Id.*
19   An MRI showed tears in the soft tissues in her knee.  AR 1459, 253.  Dr. Barad thought her ankle
20   was recovering well, and he thought she was "just about ready" to begin physical therapy, but he
21   had concerns about a possible injury in her knee.  AR 253.  He decided to wait and watch her
22   progress and see her again in six weeks.  *Id.*  He thought surgery might eventually be necessary.
23   *Id.*

24   Before six weeks had passed, however, Logan was back in Dr. Barad's office.  AR 252.
25   As before, her ankle was getting stronger, but her knee was in pain.  *Id.*  X-rays and an MRI
26   suggested the anterior cruciate ligament (ACL) in her left knee was stretched or torn.  *Id.*  Dr.
27   Barad prescribed physical therapy, anti-inflammatory medication, and exercise.  *Id.*  He did not
28   think surgery was necessary yet.  *Id.*  But by the next month, in April, the swelling and pain in

1    Logan's ankle was subsiding, but her knee was still in pain. AR 253. Dr. Barad reviewed the
2    benefits and risks of a diagnostic surgery with Logan, and she told him she wanted to move
3    forward with that plan before she went back to work. *Id.* Dr. Barad instructed her not to spend
4    time sitting, standing, walking, driving, climbing, or working, but he did not impose restrictions
5    against using a keyboard or rotating her wrists. AR 32. In May, a surgery was scheduled. AR 9.
6    Logan told Sentry, and it submitted a claim for long-term disability insurance coverage to
7    Prudential on her behalf. AR 7–8.

8        Dr. Barad performed the surgery later the same month. AR 437–38. Afterward, he told
9    Sentry that Logan would not be able to work again until June, if not later. AR 233–34. He
10   instructed her again not to spend time sitting, standing, walking, and driving, among other things,
11   but he did not impose limits on her use of a keyboard. AR 233.

12       Unfortunately, Logan's condition did not significantly change for the better. She
13   described her symptoms in detail in a statement she later submitted with a claim for long-term
14   disability insurance. She could not "sit or stand for long periods of time." AR 323. She had
15   "chronic pain in her left ankle with stiffness, swelling & popping," "stabbing pain" in her left heel
16   and foot, "chronic" pain and "tightness" in her knee, headaches, and pain in her left leg, hip, arm,
17   shoulder and neck." *Id.* She could not walk without assistance. *Id.* She could not focus or
18   concentrate. *Id.*

19       Prudential requested medical records from Dr. Barad and asked him to fill out a
20   questionnaire. AR 243–50. He gave her diagnoses using ICD10 codes: "M23.009," which
21   indicates "cystic meniscus, unspecified meniscus, unspecified knee," and "S82.91xA," for
22   "unspecified fracture of right lower leg, initial encounter for closed fracture."[1] AR 248. He
23   estimated Logan would be able to return to work full time by the end of August. AR 249–50.

---

[1] ICD-10 refers to the tenth edition of an international medical classification list, the "International Statistical Classification of Diseases and Related Health Problems." *See* World Health Organization, "International Statistical Classification of Diseases and Related Health Problems (ICD)," https://www.who.int/standards/classifications/classification-of-diseases (last visited Nov. 7, 2022). The court takes judicial notice of this information. *See Druhot v. Reliance Standard Life Ins. Co.*, No. 16-CV-2053, 2017 WL 4310653, at *2 n.3 (N.D. Ill. Sept. 28, 2017) (taking judicial notice of ICD codes and definitions as undisputed matters of public record).

1  Although he checked "no" in response to the question, "Are you opining any restrictions and
2  limitations for this patient?" he responded later on that Logan could not spend any time standing,
3  walking, sitting, climbing stairs, climbing ladders, stooping, kneeling, reaching overhead, or
4  lifting and carrying more than 10 pounds.  AR 247, 249.  He did not impose limits on her use of a
5  computer mouse or keyboard.  AR 249.  Logan also spoke to a Prudential employee on the phone
6  during this time.  She described similar problems.  *See* AR 282–83.

7  In another follow-up visit in July 2019, Dr. Barad saw some swelling in Logan's knee, but
8  only a "little bit."  AR 1673.  Her ankle had also swelled, but she had a good range of motion.  *Id.*
9  He recommended "bracing and activity as tolerated."  *Id.*  In a report to Prudential, he noted
10 restrictions against prolonged standing, walking, sitting, climbing, and heavy lifting, among other
11 things, but not keyboarding.  AR 1417.  He gave her a three-month prognosis to return to work.
12 AR 1416, 1418.  At about the same time, a different doctor, Paramjit Takhar, diagnosed Logan
13 with a pinched nerve in her neck, namely radiculopathy in the cervical region.  AR 1661.

14 Prudential was reviewing Logan's long-term disability insurance claim at about this same
15 time.  Logan would be entitled to long-term disability benefits if she had a "disability."  AR 69.
16 For Logan's claim, the policy defines "disability" using three criteria.  First, employees must be
17 "unable to perform the material and substantial duties" of their "regular occupation" due to
18 "sickness or injury."  AR 81 (emphasis omitted).  "Material and substantial duties means duties
19 that: are normally required for the performance of your regular occupation; and cannot be
20 reasonably omitted or modified."  *Id.* (emphasis omitted).  Second, employees must be under
21 "regular care of a doctor."  *Id.* (emphasis omitted).  Third, employees must have sustained a loss
22 in monthly earnings of 20 percent or more due to that sickness or injury.  *Id.* (emphasis omitted).

23 Heidi Garcia, a nurse employed by Prudential, reviewed Logan's claim and medical
24 records.  In Garcia's opinion, it would be reasonable to expect someone in Logan's situation to
25 have no capacity for about three months after her first surgery, then limited capacity for the next
26 two months.  *See* AR 1457–61.  Garcia also believed it would be reasonable to expect Logan to
27 have no capacity to work for two to four weeks after her second surgery in late May.  AR 1461.
28 Beyond that, however, Garcia thought it would be reasonable to expect Logan to return to work.

1   *Id.* A vocational expert also decided Logan's position, her "regular occupation," was
2   "sedentary." AR 1484–86.

3   Prudential determined Logan did not meet the policy's definition of "disability," so it
4   denied her claim. AR 1486. Based on its review of her medical records, it was "unclear" to
5   Prudential why Logan was "not released to full time return to work 2–4 weeks" after her second
6   surgery. AR 1485. According to a call log, Prudential informed Logan "[i]t doesn't appear your
7   condition would prevent you from performing the material and substantial duties of your regular
8   occupation beyond that." AR 1504.

9   In its letter, Prudential recognized that the Social Security Administration had approved
10  Logan's claim for Social Security Disability benefits. AR 1486. That approval did not change
11  Prudential's decision to deny benefits. *Id.* Its explanation was unenlightening. *Id.* "[T]he Social
12  Security Administration (SSA) must make their determinations based on the information
13  available to them and their rules and guidelines," Prudential wrote, "and we must render our
14  decisions based on the information available in your . . . file and the provisions of the . . . Plan."
15  *Id.*

16  After Prudential denied Logan's claim, she saw another doctor, Phong Le, a physical
17  therapist. AR 1676. He diagnosed her with "painful hardware in the left ankle and mild ankle
18  OA," i.e., osteoarthritis. AR 1678. He spent more than 45 minutes speaking with her about her
19  file and treatment options. *See id.* She decided to "undergo elective surgery for hardware
20  removal." *Id.* In a later visit, she had not yet undergone this surgery, and Dr. Le described her
21  condition as "temporarily disabled." AR 1681. In his words, she had an "orthopedic device
22  screw that is too long and interfering with her joint (ankle) and bone which is causing pain when
23  she moves or walk[s]." *Id.* His advice was to "preserve her joint and bone" by "not walking, or
24  using [the] joint specifically, and to not sit for long periods of time." *Id.*

25  During this time, Logan still claimed to be in daily pain. AR 1588. She could not sit or
26  stand for more than 10 minutes without pain. *Id.* She was "always on pain medication," which
27  made her "sleepy, dizzy and nervous," slowed her thinking, and dulled her focus. *Id.* She
28  depended on her family for help and used a crutch to walk. *Id.*

1    Logan later appealed Prudential's decision to deny her claim. AR 1572–87. Prudential
2    referred her case to a consultant, Ephraim K. Brenman, D.O. AR 1709–15. After reviewing the
3    file, he gave an opinion in Prudential's favor. AR 1713–15. In his opinion, although Logan's
4    conditions prevented her from squatting, walking, and standing for long periods without breaks,
5    among other activities, she should have been able to sit and work at a desk and use a keyboard,
6    mouse, and phone. AR 1713. Brenman sent a questionnaire to Dr. Barad, who responded that he
7    had not seen Logan for several months and could not answer specific questions. AR 1913.

8    Prudential sent Brenman's report to Logan and her counsel for comment. AR 1763–64.
9    Logan's counsel responded on her behalf, enclosing a letter from Dr. Le. AR 1779–86. He
10   reaffirmed his diagnosis of osteoarthritis, explained the complications caused by orthopedic
11   hardware in her ankle, and expressed his opinion that Logan had been disabled since December
12   2018, when she fell from the ladder. AR 1784. In his opinion, "prolonged walking, sitting, or
13   using the joint specifically cause Ms. Logan pain and would further damage Ms. Logan's left
14   ankle joint and bone." AR 1785. Dr. Brenman reviewed Dr. Le's letter but did not change his
15   opinion. AR 1803–06. He found "a lack of consistent documentation and records" showing
16   Logan had "significant limitations and restrictions from medication side effects." AR 1804. He
17   dismissed Dr. Le's opinions as founded on her own reports of "subjective pain." *Id.* Prudential
18   upheld its decision to deny long-term disability benefits based on Dr. Brenman's opinion.
19   AR 1853–56. It concluded again that Logan could have begun working again within two to four
20   weeks after her second surgery. *See id.*

21   Logan then filed her complaint in this case under 29 U.S.C. § 1132. *See generally*
22   Compl., ECF No. 1; 29 U.S.C. § 1132(a)(1)(B) & (g)(1). The parties have fully briefed her
23   challenge to Prudential's decision. *See generally* Pl.'s Br., ECF No. 23; Def.'s Br., ECF No. 21;
24   Pl.'s Resp., ECF No. 25; Def.'s Resp., ECF No. 26. The court submitted the matter without
25   hearing oral argument.

26   **II.    LEGAL STANDARDS**

27   "ERISA was enacted to promote the interests of employees and their beneficiaries in
28   employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disability*

6

*Plan v. Nord*, 538 U.S. 822, 830 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)). Under ERISA's civil enforcement provisions, a plan participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. Prudential does not argue the plan gives it discretionary authority, *see* Def.'s Br. at 12, so this court reviews de novo.

District courts reviewing de novo "undertake an independent and thorough inspection of an administrator's decision." *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 728 (9th Cir. 2006). When, as in this case, the dispute will be resolved by a motion for judgment under Federal Rule of Civil Procedure 52, the court makes findings of fact, evaluates conflicting testimony, and decides what is most likely true. *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc). "[T]he court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010). "[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant." *Id.* at 1294.

**III.   DISCUSSION**

    **A.   The Administrative Record and Evidentiary Objections**

As a threshold matter, the parties disagree what evidence the court should consider. Their disagreement has two parts. First, Logan asks the court to consider the Social Security Administration's letter confirming she had been awarded Social Security disability benefits. *See* Mot. Expand, ECF No. 17; Mem., ECF No. 17-1; *see also* Award Letter, Logan Decl. Ex. 7, ECF No. 17-9; Reply ECF No. 19. Prudential argues the letter should not be made a part of the record. *See* Opp'n at 2. Second, Prudential objects to a declaration and exhibits Logan submitted with

7

her responsive brief.  *See generally* Def.'s Obj., ECF No. 27; Def.'s Resp., ECF No. 31.  Logan argues the court should consider this evidence because it responds to new arguments Prudential raised for the first time in this court.  *See generally* Pl.'s Resp., ECF No. 28; Pl.'s Obj., ECF No. 29.

When a district court reviews a plan administrator's decision de novo, it is ordinarily limited to the same record as the administrator.  *See Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943 (9th Cir. 1995).  A district court may admit additional evidence "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision."  *Id.* at 944 (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc)).  The Ninth Circuit has identified several circumstances in which it might be necessary to look beyond the administrative record.  *See Opeta v. Nw. Airlines Pens. Plan for Contract Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007).  Logan cites three.  Mem. at 13–17.  First, it might be necessary to look beyond the administrative record if the claimant could not have presented the new evidence in the administrative process.  *See Opeta*, 484 F.3d at 1217 (quoting *Quesinberry*, 987 F.2d at 1027).  Second, new evidence can be admitted if necessary to help the court answer "complex medical questions" or assess "the credibility of medical experts."  *Id.* (quoting *Quesinberry*, 987 F.2d at 1027).  Third, new evidence might be necessary when "the payor and the administrator are the same entity and the court is concerned about impartiality."  *Id.* (quoting *Quesinberry*, 987 F.2d at 1027).

Logan has not shown it is necessary to consider the Social Security award letter here, given its contents or lack thereof.  The letter does not include more information about Logan's condition or treatment, does not explain what evidence the Social Security Administration considered, and does not explain the award decision.  It states simply that Logan "is entitled to monthly disability benefits."  Award Letter at 1.  Because the letter states only a conclusion, it does not help answer "complex medical questions," show any expert's opinions are not credible, or resolve concerns about impartiality.  In that way, this case differs from those in which courts have expanded the record to include evidence about a Social Security Administration decision.

*See, e.g.*, *Nagy v. Grp. Long Term Disability Plan for Emps. of Oracle Am., Inc.*, 183 F. Supp. 3d 1015, 1025 (N.D. Cal. 2016) (admitting evidence of administrative law judge's decision because administrative law judge had "heard testimony from the claimant, evaluated the medical record, and made a well-reasoned disability determination"), *aff'd in relevant part*, 739 F. App'x 366, 367 (9th Cir. 2018).

This is not to say the award letter is necessarily irrelevant. If the Social Security Administration concluded Logan is "disabled" under the terms of the federal laws and regulations that govern Social Security disability payments, then it could be more likely than not that Logan is also "disabled" under the terms of Prudential's plan. *See, e.g.*, *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006) (affirming district court's decision to rely on Social Security Administration findings "even though they were not binding on the ERISA Plan, and even though the [Administration's] definition of disability may differ from that in the [long-term disability plan]"). To that end, the record includes evidence Prudential was aware Logan had been "approved for Social Security Disability Benefits," AR 1486, as noted above. But this court's task is not to consider all relevant evidence; it is instead to evaluate Prudential's decision. *See, e.g.*, *Silver*, 466 F.3d at 732 n.2 (affirming exclusion of Social Security award letter that "merely repeat[ed] information that was already available"); *Dorsey v. Metro. Life Ins. Co.*, No. 15-02126, 2017 WL 3720346, at *10 (E.D. Cal. Aug. 29, 2017) (denying motion to admit similarly terse Social Security award letter); *Carroll v. Hartford Life & Acc. Ins. Co.*, 937 F. Supp. 2d 247, 274 (D. Conn. 2013) ("[Social Security Disability Insurance] benefit determinations are not binding on ERISA plans . . . ."). Logan's motion to expand the administrative record is denied.

The court also declines to consider the new evidence Logan submitted with her responsive brief. As explained in the separate section below, Prudential cannot ask the court to affirm based on a theory or arguments Prudential did not rely on during the administrative process, so the court will not consider Prudential's new arguments. *See infra* section III.C. It is unnecessary to add evidence to the administrative record to address these new arguments.

B.     **Prudential's Decision to Deny Benefits**

Prudential denied Logan's claim for long-term disability benefits because it decided she was not "disabled" a few weeks after her second operation. As summarized above, the policy defines "disability" using three criteria. AR 81. Prudential cited the first when it denied her claim: was Logan "unable to perform the material and substantial duties" of her "regular occupation" due to "sickness or injury"? *Id.* (emphasis omitted).

Logan's position as senior claims administrator required her to focus for several hours a day while sitting. AR 7, 1588–89. After she fell from a ladder in December 2018, however, she could not sit for long periods without pain. As detailed in the background section above, she sought and obtained treatment for many months, including two surgeries, physical therapy, and narcotic pain medication. After her second surgery, she still could not sit or stand for long periods without pain in her ankle, foot, knee, arm, neck, and shoulder. AR 323, 282–83, 1659–61. She was diagnosed with osteoarthritis, radiculopathy, and painful orthopedic screws. AR 1661, 1784. Her doctors instructed her not to spend long periods of time sitting or standing. AR 249–50, 1417, 1681, 1785. Le, her physical therapist, reported several months after her second surgery that she should not sit for long periods of time, lest she further damage her ankle. AR 1785. Logan's medications also cause drowsiness and dizziness and reduce her concentration. AR 1588, 1786.

Prudential argues the court should disregard Barad and Le's opinions as conclusory and unsupported by medical evidence. *See* Def.'s Br. at 16; Def.'s Resp. at 16–17. Both doctors' medical opinions and recommendations were based on their first-hand examinations of Logan and the objective evidence they gathered during those examinations. *See, e.g.*, AR 1418 ("My opinion is based on . . . [o]bjective findings."); AR 1681 (citing x-rays, medical records, and examinations). The court will not disregard their opinions. Further, the Social Security Administration approved Logan's claim for disability benefits after her second surgery. *See* AR 1486. It could not have done so without concluding her injury was "of such severity" that she was "not only unable to do [her] previous work," but also could not "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see*

10

*also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  The Social Security Administration's decision to award disability benefits corroborates Logan's own and her doctors' accounts of her disabling pain.

The court finds no reason to doubt Logan's claims of pain and inability to work in her position.  It is not unusual for her to rely heavily on her own accounts of pain.  "[I]ndividual reactions to pain are subjective and not easily determined by reference to objective measurements."  *Hertan v. Unum Life Ins. Co. of Am.*, 111 F. Supp. 3d 1075, 1085 (C.D. Cal. 2015) (alterations in original) (quoting *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008)).  Pharmacy and treatment records can add an objective element to this necessarily subjective measurement.  *See Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009).  They do in this case.  Logan consistently sought treatment for her pain, including surgeries and physical therapy, for many months.  The evidence of this treatment, reviewed above, corroborates her claims of pain.  It is unlikely she undertook this extensive, intrusive, and lengthy effort to treat an invented ailment.  *See, e.g.*, *Hertan*, 111 F. Supp. 3d at 1086 ("Plaintiff's course of treatment, beginning with her surgery . . . and follow-up care . . . , establishes that she persistently sought treatment options for her pain."); *cf. Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (rejecting as improbable theory that Social Security claimant fooled her doctors into treating pain she did not have).

In sum, the opinions of Logan's physicians, her own statements and actions, and the Social Security Administration's approval decision all support Logan's claim that she could not do her job as a result of her injury.  Prudential, however, denied her long-term disability claim.  It relied on the opinions of two medical professionals: Garcia, a nurse, and Brenman, a doctor.

The court gives little weight to Garcia's conclusions.  No evidence shows Garcia has training or experience diagnosing or treating injuries like Logan's.  Garcia did not meet or examine Logan.  She spoke to her on the phone and reviewed her medical records.  *See* AR 1457–61.  She does not explain why she discounted Logan's description of her symptoms and limits and why she rejected the opinions of Logan's physicians; she concluded summarily that a

1    "reasonable" employee would already have returned to work.  AR 1460–61.  Prudential is also
2    Garcia's employer, so she faced an incentive to give an opinion in Prudential's favor.

3    Brenman's opinion offers only meager support to Prudential's decision.  Although
4    Brenman is qualified to opine about injuries like those Logan suffered, given that he is a
5    physician with a board certification in physical medicine, rehabilitation, and pain management,
6    *see* AR 1715, he is not more qualified than Logan's own physicians.  Barad is an orthopedic
7    surgeon and Le is a physical therapist.  *See* AR 251, 1784–86.  And unlike Brenman, Barad and
8    Le examined and treated Logan extensively.  Each met with her several times.  Brenman did not
9    examine or meet Logan.  He relied only on her written medical records.

10   The court recognizes "there is nothing inherently improper with relying on a file review,
11   even one that disagrees with the conclusions of a treating physician."  *Shaw v. AT & T Umbrella*
12   *Ben. Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015) (quoting *Calver v. Firstar Fin. Inc.*, 409 F.3d
13   286, 297 n.6 (6th Cir. 2005)).  But the plan here gave Prudential authority to request an in-person
14   examination.  AR 81.  Its decision not to exercise that right "'raises questions' about the
15   thoroughness and accuracy of the benefits determination."  *Montour*, 588 F.3d at 634 (alterations
16   omitted) (quoting *Bennett v. Kemper Nat'l Sevs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008)).

17   That is not the only fault in Brenman's analysis.  Brenman's conclusions rest largely on
18   his observations about what is missing, that is an absence of explanation or information in her
19   records.  *See, e.g.*, AR 1714 ("There is no consistent documentation or multiple notes that support
20   the claimant's left shoulder is causing any limitation or restrictions.  There is no documentation
21   that supports that the claimant cannot stand or sit no more than 10 minutes at a time.").  But in
22   fact Brenman relied on her medical records selectively.  As Logan points out, for example,
23   Brenman cited her complaints of pain in the months following her first operation, but not in later
24   months, and he minimized the evidence of her pain and discomfort, which included her own
25   description and her prescription for narcotics.  *See* Pl.'s Br. at 14–15 (citing AR 1410–13, 1457–
26   61, 1588–89, 1713–14).  Brenman did not explain why he discounted Logan's own reports of her
27   pain and the side effects of her medication.  In short, his analysis was just as likely "a result-

oriented review to find inconsistencies" as an objective investigation of her condition. *Sullivan v. Prudential Ins. Co. of Am.*, No. 12- 01173, 2014 WL 3529974, at *33 (E.D. Cal. July 15, 2014).

Other courts have discounted Dr. Brenman's analyses and insurers' reliance on his opinions analyses for similar reasons. *See Tracia v. Liberty Life Assurance Co. of Bos.*, 164 F. Supp. 3d 201, 226 (D. Mass. 2016) (finding Brenman's opinions "seriously flawed" as result of his inconsistent demands for corroboration of pain); *Bradford v. Life Ins. Co. of N. Am.*, 49 F. Supp. 3d 789, 797 (E.D. Wash. 2014) ("Inexplicably, Dr. Brenman opined that Plaintiff 'has no restrictions to sitting.' This conclusion runs directly contrary to the [evaluation] upon which Dr. Brenman purported to rely and is manifestly inconsistent with the record as a whole."); *Kaufmann v. Metro. Life Ins. Co.*, 658 F. Supp. 2d 643, 650 (E.D. Pa. 2009) (rejecting Brenman's conclusions because he "did not give any rationale, other than a claimed lack of objective findings, for his contradicting or ignoring the treating physicians").

Brenman also was part of an organization, "MES Peer Review Services," whose physicians regularly consult for plan administrators, such as Prudential. *See* AR 1709; *see also, e.g.*, *Garrison v. Aetna Life Ins. Co.*, 558 F. Supp. 2d 995, 1002 n.6 (C.D. Cal. 2008) (noting MES's relationships with insurers like Prudential). Although Brenman's compensation did not depend on his conclusions, AR 1715, he was engaged by Prudential, so if he and the organization hope to be engaged again in the future, they faced an incentive to favor Prudential. *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 902 (9th Cir. 2016) ("Even if MetLife operated with no structural conflict, reliance on the reports of its retained experts who have a financial incentive to make findings favorable to MetLife may warrant skepticism.").

For these reasons, Logan has proven she was "disabled" under the terms of the plan, meaning Prudential incorrectly denied her claim for long-term disability benefits.

**C.     Benefits Award**

Prudential argues that regardless of whether Logan was initially entitled to long-term disability benefits, she would no longer have been eligible after December 27, 2019. Def.'s Br. at 18–19. As noted above, to be "disabled," a plan participant must be under a doctor's "regular care." AR 81. The plan defines "regular care" as requiring a participant to be "receiving the

1  most appropriate medical care, which conforms with generally accepted medical standards."
2  AR 82.  Prudential argues that after December 27, 2019, Logan did not follow Le's advice to treat
3  the painful orthopedic screw in her ankle, which in its view shows she was not "receiving the
4  most appropriate medical care" from that date onward.  *See* Def.'s Br. at 18–19.

5  But Prudential did not rely on this logic to deny Logan's claim.  The court declines to
6  uphold Prudential's decision for reasons its attorneys have offered only after the fact.  *See, e.g.*,
7  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006) (en banc) (rejecting
8  administrator's attempt to give "new reason for denying benefits" at point in administrative
9  process that "preclud[ed] the plan participant from responding to that rationale for denial at the
10 administrative level").  As with the decisions of an administrative agency, a plan administrator's
11 decision "must be upheld, if at all, on the same basis" it offers in the administrative process, "not
12 a subsequent rationale articulated by counsel."  *Jebian v. Hewlett-Packard Co. Emp. Benefits*
13 *Org. Income Prot. Plan*, 349 F.3d 1098, 1104–05 (9th Cir. 2003) (quoting *Federal Power*
14 *Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)).  And in any event, Logan's "decision not to
15 undergo surgery that could potentially improve her condition does not render her ineligible to
16 receive benefits."  *Rios v. Unum Life Ins. Co.*, No. 19-04100, 2020 WL 7311343, at *3 (C.D. Cal.
17 Dec. 10, 2020), *aff'd in relevant part*, 2021 WL 6116635 (9th Cir. Dec. 27, 2021).  "A plaintiff is
18 neither non-compliant nor is she required to undergo invasive treatments, such as surgery, when
19 the policy does not require her to pursue the most aggressive treatment as a condition of
20 eligibility to receive benefits."  *Id.*

21 Prudential also asks the court not to make any decisions about whether Logan is entitled to
22 benefits after July 2, 2021.  *See* Def.'s Br. at 19–20.  It argues that under the plan, she would not
23 be eligible for long-term disability benefits after that date unless she could not perform the duties
24 "of any gainful occupation for which [she is] reasonably fitted by education, training, and
25 experience."  *Id.* at 19 (alterations in original) (quoting AR 81).  The administrative record does
26 not include information allowing the court to decide whether Logan can perform the duties "of
27 any gainful occupation."  The court will thus remand the matter to Prudential for a decision on
28 that question.  *See, e.g.*, *Saffle*, 85 F.3d at 460 (declining not to award longer-term, broader

disability benefits because "there [was] nothing in the administrative record about general disability").

In sum, on the record presently before the court, Logan was disabled throughout the elimination period and was entitled to benefits until July 2, 2021.

### D. Fees, Interest, and Costs

Logan requests an award of fees, interest, and costs. *See* Compl. at 30; Pl.'s Br. at 20. Prudential makes no arguments in opposition to that request.

ERISA permits a district court to award "a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). "[A]bsent special circumstances, a prevailing ERISA employee plaintiff should ordinarily receive attorney's fees from the defendant." *McConnell v. MEBA Med. & Benefits Plan*, 778 F.2d 521, 525 (9th Cir. 1985) (quoting *Smith v. CMTA-IAM Pens. Tr.*, 746 F.2d 587, 590 (9th Cir. 1984)). There are no "special circumstances" in this case. Logan is entitled to an award of her reasonable attorneys' fees and costs. In the absence of information in the record allowing the court to award specific amounts, the court directs the parties to meet and confer about the amount of a reasonable fee and cost award, resorting to motion practice if needed.

A district court may also award prejudgment interest in ERISA cases "to compensate a claimant for the loss she incurred as a result of the administrator's nonpayment of benefits." *Reetz v. Hartford Life & Accident Ins. Co.*, 294 F. Supp. 3d 1068, 1086 (W.D. Wash. 2018) (citing *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 988 (9th Cir. 2001)). "Whether interest will be awarded is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." *Shaw v. Int'l Ass'n of Machinists & Aerospace Workers Pens. Plan*, 750 F.2d 1458, 1465 (9th Cir. 1985) (quoting *Wessel v. Buhler*, 437 F.2d 279, 284 (9th Cir. 1971)). Ordinarily, the appropriate prejudgment interest rate is the rate prescribed in 28 U.S.C. § 1961. *See Reetz*, 294 F. Supp. 3d at 1086. The court awards prejudgment interest at the statutory rate to compensate Logan for the passage of time since plan benefits were first due and unpaid. *See Dishman*, 269 F.3d at 988 (emphasizing compensation as purpose of pre-judgment interest).

## IV. CONCLUSION

Logan's motion to expand the administrative record is **denied**, and the parties' evidentiary objections are **overruled as moot**.

Logan is "disabled" under the terms of the plan. She is entitled to benefits from June 19, 2019 through July 2, 2021 and prejudgment interest on that award at the rate prescribed by 28 U.S.C. § 1961. The court **remands** the matter to allow Prudential to consider whether Logan is entitled to long-term disability benefits after July 2, 2021, subject to Logan's ability once again to return to this court if she wishes to challenge Prudential's ultimate determination of this question.

The parties are directed to meet and confer with the goal of reaching an agreement on a reasonable award of attorneys' fees and costs. **Within thirty days**, the parties must file a joint status report. If the parties reach an agreement on an award, their report should include a proposed order approving the award. If they do not reach an agreement, their report should propose a schedule for briefs on an appropriate award of fees and costs.

This order resolves ECF Nos. 17 and 21.

IT IS SO ORDERED.

DATED: November 9, 2022.

_____
CHIEF UNITED STATES DISTRICT JUDGE